THE HONORABLE RICHARD A. JONES

FILED _____ ENTERED
LODGED _____ RECEIVED

AUG 0 5 2011   RE

AT SE
CLERK U.S. DI
WESTERN DISTRIC
BY

11-CV-872 -PLAGR

# UNITED STATES DISTRICT COURT

for the

## WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

| | | |
|---|---|---|
| DEBORAH R. BEATON, | ) | CASE NO. 2:11-cv-00872-RAJ |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | PLAINTIFF'S MEMORANDUM IN |
| JPMORGAN CHASE BANK, N.A.; and | ) | SUPPORT OF AMENDED |
| NORTHWEST TRUSTEE SERVICES, INC. | ) | VERIFIED COMPLAINT |
| Defendants, | ) | |
| | ) | |

Plaintiff, DEBORAH R. BEATON, proceeding without counsel, hereby submits this Memorandum in Support of the Plaintiff's Second Amended Verified Complaint.

1. The law respects form less than substance: The OCC says in the attached document (Exhibit "A") that the substance of the transaction is that the investors, and not the trustee, owns the [securitized] loans. Any claim, right or set-offs from the obligation of the loan would not fall on the trustee, but on the investors. If the OCC letter can be relied upon, which it ought to be, one may conclude that the investors (allegedly) have the beneficial interest or (possibly) equitable title, however they gave this up as part of the agreement as evidence by accepting delivery of Certificates over the delivery of

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 1 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

the endorsed Note. All the Parties took the Plaintiff's Note "WITHOUT RECOURSE". With this arrangement it is virtually impossible to have a holder in due course.

2.  There is no clear statute or decision that Washington law permits MERS to serve as beneficiary. The following rulings favor the borrower over MERS:

    a.  *Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark.*, 301 S.W.3d 1 (Ark. 2009).

    b.  *In re Agard*, No. 810-77338-reg (E.D.N.Y.) Bankr. Feb. 10, 2011).

    c.  *Hooker v. Northwest Trustee Services, Inc., Case No. 1:10-cv-03111-PA USDC for District of Oregon (Order of 5/25/2011).*

    d.  See also Christopher L. Petersen, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L. Rev. 1359 (2010).

3.  Congressional Oversight Panel, November 16, 2010, NOVEMBER OVERSIGHT REPORT, Pages 1,2,3,18 (attached as Exhibit "B").

4.  The June 7, 2011, New York Appellate Court ruling in the matter of Bank of New York v. Silverberg, 17464/08 (attached as Exhibit "C"), is believed to have a direct and binding effect on the instant matter because the FREMONT HOME LOAN TRUST 2006-E is a New York statutory trust and its related Pooling and Servicing Agreement is regulated by New York state laws; and, the ruling also adverse to MERS.

5.  *Horace v. LaSalle Bank, N.A.,* case no. CV 08-362 IN THE CIRCUIT COURT OF

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 2 of 11

**Deborah R. Beaton, Plaintiff**
**31431 46th Pl SW**
**Federal Way, WA 98023**
**(509) 499-1607**

RUSSEL COUNTY, ALABAMA, Order, dated March 21, 2011. The AFFIDAVIT AND TESTIMONY OF THOMAS J. ADAMS (attached as Exhibit "D") is of special notice.

6. The Published Opinion *In re: Veal*, Bk. No. 09-14808, 9th Cir. BAP, June 10, 2011, Case No. 10-1055 [2011 WL 2304200], Chapter III. Discussion §(B)(1) page 17: (underline and emboldened printed is added for emphasis only) **"Here, the parties assume that the Uniform Commercial Code ("UCC") applies to the Note. If correct, ....".** The 9th Cir. BAP Court made this ruling based upon the agreement of the parties that UCC applied to the note. This ruling is believed to have a direct and binding effect on the instant matter because here, the Plaintiff does not assume and never intended that the UCC applies to the purported Note.

7. Excerpt from a typical REIT/REMIC Prospectus/Pooling and Servicing Agreement with all emphasis added:
"**Waiver or Modification of Mortgage Loan Terms.**
The Servicers may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any term of any Mortgage Loan so long as that waiver, modification or postponement is not materially adverse to the Trust Fund; provided, however, that unless the mortgagor is in default or such default is imminent, the applicable Servicer may not permit any modification for any Mortgage Loan that would change the Mortgage Rate, defer or forgive the payment of principal or interest, reduce or increase the outstanding Scheduled Principal Balance (except for actual payments of principal) or change the final maturity date on that Mortgage Loan. **However, the related Servicer may not make or permit any modification, waiver or amendment of any term of any Mortgage Loan that would cause any REMIC created under the Trust Agreement to fail to qualify as a REMIC or result in the imposition of any tax.**"

8. PROHIBITED TRANSACTION:

   a. 26 USC §857(b)(6)(B)(iii) the term "prohibited transaction" means a sale or other disposition of property described in section 1221(a)(1) which is not foreclosure property.

   b. 26 USC §1221(a)(1) stock in trade of the taxpayer or other property of a kind

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 3 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

c. 26 CFR §1.856-6 (a) In general. Under 856(e) a real estate investment trust may make an irrevocable election to treat as "foreclosure property" certain real property ......

d. 26 USC § 856(e) Special rules for foreclosure property

(1) Foreclosure property defined

For purposes of this part, the term "foreclosure property" means any real property (including interests in real property), and any personal property incident to such real property, acquired by the real estate investment trust as the result of such trust having bid in such property at foreclosure, or having otherwise reduced such property to ownership or possession by agreement or process of law, after there was default (or default was imminent) on a lease of such property or on an indebtedness which such property secured. Such term does not include property acquired by the real estate investment trust as a result of indebtedness arising from the sale or other disposition of property of the trust described in section 1221(a)(1) which was not originally acquired as foreclosure property.

(5) Taxpayer must make election

Property shall be treated as foreclosure property for purposes of this part only if the real estate investment trust so elects (in the manner provided in regulations prescribed by the Secretary) on or before the due date (including any extensions of time) for filing its return of tax under this chapter for the taxable year in which such trust acquires such property. A real estate investment trust may revoke any such election for a taxable year by filing the revocation (in the manner provided by the Secretary) on or before the due date (including any extension of time) for filing its return of tax under this chapter for the taxable year. If a trust revokes an election for any property, no election may be made by the trust under this paragraph with respect to the property for any subsequent taxable year.

e. 26 USC § 856 (c) Limitations

A corporation, trust, or association shall not be considered a real estate investment trust for any taxable year unless—

(1) it files with its return for the taxable year an election to be a real estate investment trust or has made such election for a previous taxable

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 4 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

year, and such election has not been terminated or revoked under subsection (g);

f.   26 USC § 856 (g) Termination of election

(1) Failure to qualify

An election under subsection (c)(1) made by a corporation, trust, or association shall terminate if the corporation, trust, or association is not a real estate investment trust to which the provisions of this part apply for the taxable year with respect to which the election is made, or for any succeeding taxable year unless paragraph (5) applies. Such termination shall be effective for the taxable year for which the corporation, trust, or association is not a real estate investment trust to which the provisions of this part apply, and for all succeeding taxable years.

(2) Revocation

An election under subsection (c)(1) made by a corporation, trust, or association may be revoked by it for any taxable year after the first taxable year for which the election is effective. A revocation under this paragraph shall be effective for the taxable year in which made and for all succeeding taxable years. Such revocation must be made on or before the 90th day after the first day of the first taxable year for which the revocation is to be effective. Such revocation shall be made in such manner as the Secretary shall prescribe by regulations.

(3) Election after termination or revocation

Except as provided in paragraph (4), if a corporation, trust, or association has made an election under subsection (c)(1) and such election has been terminated or revoked under paragraph (1) or paragraph (2), such corporation, trust, or association (and any successor corporation, trust, or association) shall not be eligible to make an election under subsection (c)(1) for any taxable year prior to the fifth taxable year which begins after the first taxable year for which such termination or revocation is effective.

(4) Exception

If the election of a corporation, trust, or association has been terminated under paragraph (1), paragraph (3) shall not apply if—

(A)the corporation, trust, or association does not willfully fail to file within the time prescribed by law an income tax return for the taxable year with respect to which the termination of the election under subsection (c)(1) occurs;

(B)the inclusion of any incorrect information in the return referred to in subparagraph (A) is not due to fraud with intent to evade tax; and

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 5 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

(C)the corporation, trust, or association establishes to the satisfaction of the Secretary that its failure to qualify as a real estate investment trust to which the provisions of this part apply is due to reasonable cause and not due to willful neglect.

(5) Entities to which paragraph applies

This paragraph applies to a corporation, trust, or association—

(A)which is not a real estate investment trust to which the provisions of this part apply for the taxable year due to one or more failures to comply with one or more of the provisions of this part (other than paragraph (2), (3), or (4) of subsection (c)),

(B)such failures are due to reasonable cause and not due to willful neglect, and

(C)if such corporation, trust, or association pays (as prescribed by the Secretary in regulations and in the same manner as tax) a penalty of $50,000 for each failure to satisfy a provision of this part due to reasonable cause and not willful neglect.

9.  Factoring – Lex Anastasiana.

    a.  *Lex Anastasiana.* A law which provides that a third person who purchased a claim or debt for less than its true or nominal value should not be permitted to recover from the debtor more than the price paid with lawful interest. Mackeld. Rom. Law §369. See Black's Law Dictionary, Revised 4th Edition.

    b.  *Factoring (quotes from Wikipedia)*: "Factoring is a financial transaction whereby a business job[ber] sells its accounts receivable (i.e., invoices) to a third party (called a factor) at a discount in exchange for immediate money with which to finance continued business. Factoring differs from a bank loan in three main ways. First, the emphasis is on the value of the receivables (essentially a financial asset), not the firm's credit worthiness. Secondly, factoring is not a loan – it is the purchase of a financial asset (the receivable). Finally, a bank loan involves two parties whereas factoring involves three."

    "The three parties directly involved are: the one who sells the receivable, the debtor, and the factor. The receivable is essentially a financial asset associated with the debtor's liability to pay money owed to the seller (usually for work performed or goods sold). The seller then sells one or more of its invoices (the receivables) at a discount to the third party, the specialized financial organization (aka the factor), to obtain cash. The sale of the receivables essentially transfers ownership of the receivables to the factor, indicating the factor obtains all of the rights and risks associated with the receivables.

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 6 of 11

**Deborah R. Beaton, Plaintiff**
**31431 46th Pl SW**
**Federal Way, WA 98023**
**(509) 499-1607**

Accordingly, the factor obtains the right to receive the payments made by the debtor for the invoice amount and must bear the loss if the debtor does not pay the invoice amount. Usually, the account debtor is notified of the sale of the receivable, and the factor bills the debtor and makes all collections."

"Critical to the factoring transaction, the seller should never collect the payments made by the account debtor, otherwise the seller could potentially risk further advances from the factor. There are three principal parts to the factoring transaction; a.) the advance, a percentage of the invoice face value that is paid to the seller upon submission, b.) the reserve, the remainder of the total invoice amount held until the payment by the account debtor is made and c.) the fee, the cost associated with the transaction which is deducted from the reserve prior to it being paid back the seller. Sometimes the factor charges the seller a service charge, as well as interest based on how long the factor must wait to receive payments from the debtor. The factor also estimates the amount that may not be collected due to non-payment, and makes accommodation for this when determining the amount that will be given to the seller. The factor's overall profit is the difference between the price it paid for the invoice and the money received from the debtor, less the amount lost due to non-payment."

"In the United States, under the Generally Accepted Accounting Principles receivables are considered *sold* when the buyer has "no recourse," or when the financial transaction is substantially a transfer of all of the rights associated with the receivables and the seller's monetary liability under any "recourse" provision is well established at the time of the sale. Otherwise, the financial transaction is treated as a *loan*, with the receivables used as collateral."

   c.  RCW 61.24.005(2) disallows a "factor" from qualifying as a beneficiary.

RCW 61.24.005(2) "Beneficiary" means the holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation.

10. Disparity in *Show me the Note / Show me the Payment* Arguments.

Washington's DTA provides that the only recourse to restrain a trustee's sale is in the Courts (RCW 61.24.030(8)(j) & RCW 61.24.130(1)) where the Note is

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 7 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

inadmissible and requests for production of the Note are deemed to lack merit.

While the Forecloser may demand payment and use a *"show me the payment"* argument to defend enforcement of alleged/unproven/even false default of a purported note, the Foreclosee's use the *"show me the note"* argument is berated as lacking merit. Courts interpreting the Washington DTA have noted that courts ruling on this issue "have routinely held that [the] 'show me the note' argument lacks merit." *Freeston v. Bishop, White & Marshall, P.S.* [2010 WL 1186276] (W.D. Wash., Mar. 24, 2010.)(quoting *Diessner v. Mortgage Electronic Registration Systems,* 618 F.Supp.2d 1184, 1187, (D. Ariz. 2009) (collecting case)); *Wright v. Accredited Home Lenders,* [2011 WL 39027 (W.D. Wash., Jan 3, 2011)(citing *Freeston,* [2010 WL 1186276]). In general mortgage notes are private, non-negotiable and inadmissible pursuant to ER 201.

Thus, there is an evident disparity between the Foreclosing Parties remedy when compared to the Foreclosed Parties remedy.

> "**Disparity** (di-spar-ə-tee). Inequality; a difference in quantity or quality between two or more things." *Black's Law Dictionary Seventh Edition.*

> "**disparity** (dĭs•păr'ĭ•tĭ) *n.; pl.* –TIES (-tĭz). Inequality; difference in age, rank, or condition; also , difference in character or kind.
> **Syn**[onym]. **Disparity, inequality. Disparity** adds to **inequality** the implication of unlikeness or incongruity. – **Ant**[onym]. Similarity, likeness, equality."
> *WEBSTER'S COLLEGIATE DICTIONARY, FIFTH EDITION.*

Disparity denies equal protection under the law and denies due process of law.

Thus, under Washington Law and related case laws, where a court finds a request for production of the Note as lacking merit the same court must also find the demand for

---

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

**Deborah R. Beaton, Plaintiff**
**31431 46th Pl SW**
**Federal Way, WA 98023**
**(509) 499-1607**

Page  8 of 11

payment and/or production of the proof of payment equally lacking in merit where the alleged default is disputed especially if the authenticity of the purported Note is disputed if justice is to be equally applied.

Where production of the Note lacks merit by operation of law as it does in Washington, production of Payment also lacks merit by operation of law and the court should restrain the trustee's sale; provided the default is disputed. To do otherwise would constitute a disparity requiring the trustee's sale to be restrained anyhow.

11. Equal Protection Under the Law (*Brother's Keeper Statute*)

    a. 42 USC §1981 Equal Rights Under the Law
      (a) Statement of equal rights
          All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
      (b) "Make and enforce contracts" defined
          For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
      (c) Protection against impairment
          The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

    b. 42 USC §1982 Property Rights of Citizens
      All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

    c. 42 USC §1983 Civil Action for Deprivation of Rights
      Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

**Deborah R. Beaton, Plaintiff**
**31431 46th Pl SW**
**Federal Way, WA 98023**
**(509) 499-1607**

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

d. 42 USC § 1985 Conspiracy to interfere with civil rights

(1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 10 of 11

**Deborah R. Beaton, Plaintiff**
**31431 46th Pl SW**
**Federal Way, WA 98023**
**(509) 499-1607**

hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

e.   42 USC §1986 Action for Neglect to Prevent

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section **1985** of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

Respectfully submitted this _____ _August 4_____, 2011,

Plaintiff: Deborah R. Beaton

Signature: _____

PLAINTIFF'S MEMORANDUM IN
SUPPORT OF AMENDED VERIFIED
COMPLAINT

Page 11 of 11

Deborah R. Beaton, Plaintiff
31431 46th Pl SW
Federal Way, WA 98023
(509) 499-1607

# EXHIBIT "A" ATTACHED

# (HEREUNDER)

O

---

Comptroller of the Currency
Administrator of National Banks

---

Washington, DC 20219

VIA FIRST CLASS MAIL

January 14, 2005

Anthony J. Sylvester
Riker, Danzig, Scherer, Hyland & Perretti. LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981

Madeline L. Houston
Houston & Totaro
56 Broad Street, Suite 1
Bloomfield, N.J. 07003

Subject:    Wells Fargo Bank, Minnesota, N.A. v. Alberta Harris, et al.
            Docket No. ESX-L-4676-02

                    and

            Bank One National Association v. Feinstein
            Docket No. F-11450-00

Dear Mr. Sylvester and Ms. Houston:

This letter is in response to your letter dated December 13, 2004, seeking the views of the Office
of the Comptroller of the Currency ("OCC") concerning preemption of certain state laws in
connection with claims and defenses asserted by the parties in the above-named cases. You
requested the OCC's views at the direction of the Honorable Kenneth S. Levy, J.S.C., presiding
judge in this litigation. For the reasons stated below, based on the facts presented in the
materials provided to us, we believe that neither 12 C.F.R. § 34.4 nor the National Bank Act
preempts application of the state laws at issue here to loans simply because they were purchased
and held by national banks acting as trustees in connection with issuance of the mortgage-backed
securities involved in this case.

**Background**

According to the materials provided with the December 13th letter addressed to me, Delta
Funding made a mortgage loan to Alberta Harris in December 1999 (Wells Fargo Complaint.

First Count ¶1), and subsequently assigned the mortgage to Wells Fargo "as Trustee for Delta Funding Home Equity Loan Trust 2000-1" (Wells Fargo Complaint, First Count ¶4). Delta Funding made a mortgage loan to Dequilla Robinson in November 1999 (Bank One Statement of Material Facts Not in Dispute ¶3), and subsequently assigned the mortgage to Bank One National Association "as Trustee in Trust for the Registered Holders of Delta Funding Home Equity Loan Asset-Backed Certificates Series 1999-3" (Certification of Harold L. Kofman, Esq. ¶¶1, 3). There is no indication that either Wells Fargo or Bank One made the original mortgage loans to Alberta Harris or Dequilla Robinson, nor does any party assert that Wells Fargo or Bank One has any other interest in these transactions except as trustees for investors in the mortgage-backed securities.

As trustee acting on behalf of the investors in Home Equity Loan Trust 2000-1, Wells Fargo filed suit against Ms. Harris alleging that she had defaulted on the loan made by Delta and sought to foreclose on the real estate she had pledged as collateral for that loan (Wells Fargo Complaint, First Count ¶¶1-14). As trustee acting on behalf of the investors in Delta Asset-Backed Certificates Series 1999-3, Bank One filed suit against Jack Feinstein, as Administrator *Ad Prosequendum* for the estate of Ms. Robinson, seeking to foreclose on the real estate she had pledged as collateral for the loan made by Delta (Memorandum of Law in Support of Plaintiff Bank One National Association's Motion for Summary Judgment at 3-4). Ms. Harris and Mr. Feinstein ("Defendants"), through counsel, opposed the foreclosure actions. They alleged in counterclaims against the Banks (and third-party claims against Delta and others) defenses based upon alleged violations of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56.8-2, which, among other things, proscribes unconscionable practices in real estate transactions. N.J.S.A. 56.8-2. *See* Defendant's Brief in Opposition to Plaintiff Wells Fargo's Motion for Partial Summary Judgment at 3; Defendant's Brief in Opposition to Plaintiff Bank One's Motion for Summary Judgment at 4. Asserting that federal law authorizing national banks to make and purchase real estate loans preempted the Defendants' state law defenses under the CFA, Wells Fargo and Bank One, as trustees acting on behalf of the investors, sought partial summary judgment on the cross-claims.

**Discussion**

Pursuant to 12 U.S.C. § 371, national banks may "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to * * * such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." The OCC's real estate lending regulations provide that, "[e]xcept where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a).

The Banks assert that application of the CFA is preempted because it would interfere with their power as national banks to purchase loans as authorized under 12 U.S.C. § 371, and that holding them liable for violations of the CFA as loan purchasers would be contrary to 12 C.F.R. § 34.4(a), which preempts state laws that interfere with national bank real estate lending authority.

-2-

Section 34.4(a)(10) states that national banks "may **make** real estate loans under 12 U.S.C. § 371 without regard to state law limitations concerning * * * [p]rocessing, origination, servicing, **sale or purchase of**, or investment or participation in, mortgages." 12 C.F.R.§ 34.4(a)(10) (emphasis added). However, in no sense, under the facts presented, can the Banks be viewed as *making* a real estate loan under 12 U.S.C. § 371 and 12 C.F.R. § 34.4. The Banks did not originate the loans. They did not fund the loans at inception. Nor did they "purchase" the loans as part of any real estate lending program comprehended by the regulation. Here, the Banks act as trustees for the benefit of investors in the trusts. The substance of the transaction is that the investors, not the Banks, are purchasing the loans that have been made by Delta. The investors own the beneficial interest in the loans held by the Banks as trustees. And the effect of any liability for violation of the CFA ultimately falls on the investors. Nowhere do the Banks allege that they themselves, as opposed to the trusts they represent, are exposed to liability for any violation of the CFA. For all these reasons, 12 U.S.C. § 371 and 12 C.F.R. § 34.4(a) simply do not apply to the transactions by which the Banks acquired legal title to the loans in the circumstances at issue here.

With respect to the activities of Wells Fargo and Bank One as trustees, the banks derive their power to act as trustees from 12 U.S.C. § 92a. When state law conflicts with national banks exercising powers granted to them by federal law, the Supremacy Clause of the United States Constitution requires that the state law yield to the paramount authority of federal law, with the result that application of the state law to national banks is preempted. The Supreme Court has explained this principle stating that it interprets "grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 32 (1996).

As the Supreme Court demonstrated in its review of preemption cases in the *Barnett* case, Supremacy Clause principles animating conflict preemption have been expressed in a wide variety of phrases that do not yield materially different meanings, including "stand as an obstacle to," "impair the efficiency of," "significantly interfere," "interfere," "infringe," and "hamper." *See Barnett*, 517 U.S. at 33. Thus, if application of the CFA to the loans held by the Banks as trustee were to obstruct, impair, condition, or otherwise interfere with the Banks' exercise of fiduciary powers granted to them under federal law, the state statute would be preempted.

Based on the facts presented, we do not believe that to be the case. The Banks have not claimed that application of the CFA would impair their ability to act as trustee in these circumstances or that the state law otherwise interferes with the performance of their legal obligations as trustee. Nor could they claim that having to respond to state law defenses to recovery on assets held in trust obstructs or impairs their power to act as trustee absent some indication that the state law infringes their authority, conditions their actions, or imposes a burden in a way prohibited by federal law. In short, the Banks' authority to act as trustees under federal law does not insulate the assets the Banks hold in trust for the benefit of investors from state law requirements otherwise applicable to those assets.

-3-

We trust that the foregoing is responsive to your request.

Sincerely,

**/s/ Daniel P. Stipano**

Daniel P. Stipano
Acting Chief Counsel

Cc:    Hon. Kenneth S. Levy, J.S.C.
       212 Washington Street
       The Wilentz Justice Complex
       General Equity, 8th Floor
       Newark, New Jersey 07102

-4-

# EXHIBIT "B" ATTACHED

# (HEREUNDER)



Congressional Oversight Panel

---

November 16,
2010

# NOVEMBER OVERSIGHT REPORT[*]

Examining the Consequences of Mortgage
Irregularities for Financial Stability and Foreclosure
Mitigation

---

*Submitted under Section 125(b)(1) of Title 1 of the Emergency Economic
Stabilization Act of 2008, Pub. L. No. 110-343

# Table of Contents

Executive Summary ..................................................................................................4

Section One:

    A.  Overview ...............................................................................................7

    B.  Background ............................................................................................9

    C.  Timeline ..............................................................................................10

    D.  Legal Consequences of Document Irregularities ..................................14

        1.  Potential Flaws in the Recording and Transfer of Mortgages and
           Violations of Pooling and Servicing Agreements.............................16

        2.  Possible Legal Consequences of the Document Irregularities to
           Various Parties ..............................................................................24

        3.  Additional Considerations ..............................................................33

    E.  Court Cases and Litigation..................................................................34

        1.  Fraud Claims.................................................................................35

        2.  Existing and Pending Claims under Various Fraud Theories...........40

        3.  Other Potential Claims...................................................................42

        4.  Other State Legal Steps..................................................................44

        5.  Other Possible Implications: Potential "Front-end" Fraud and
           Documentation Irregularities .........................................................46

    F.  Assessing the Potential Impact on Bank Balance Sheets......................51

        1.  Introduction...................................................................................51

        2.  Foreclosure Irregularities: Estimating the Cost to Banks .................59

        3.  Securitization Issues and Mortgage Put-backs ................................63

G.  Effect of Irregularities and Foreclosure Freezes on Housing Market....................73

    1.  Foreclosure Freezes and their Effect on Housing .............................................73

    2.  Foreclosure Irregularities and the Crisis of Confidence ....................................78

H.  Impact on HAMP ..................................................................................................79

I.  Conclusion ............................................................................................................82

Section Two: Correspondence with Treasury..................................................................85

Section Three: TARP Updates Since Last Report ...........................................................86

Section Four: Oversight Activities...................................................................................122

Section Five: About the Congressional Oversight Panel .................................................124

Appendices:

APPENDIX I: LETTER FROM CHAIRMAN TED KAUFMAN TO
SPECIAL MASTER PATRICIA GEOGHEGAN, RE: FOLLOW UP TO
EXECUTIVE COMPENSATION HEARING, DATED NOVEMBER 1, 2010......125

iii. Mortgage Securitization Process

Figure 1: Transfer of Relevant Paperwork in Securitization Process[36]



Securitizations of mortgages require multiple transfers, and, accordingly, multiple
assignments. Mortgages that were securitized were originated through banks and mortgage
brokers – mortgage originators. Next they were securitized by investment banks – the sponsors –
through the use of special purpose vehicles, trusts that qualify for Real Estate Mortgage
Investment Conduit (REMIC) status. These trusts are bankruptcy-remote, tax-exempt vehicles
that pooled the mortgages transferred to them and sold interests in the income from those
mortgages to investors in the form of shares. The pools were collateralized by the underlying
real property, because a mortgage represents a first-lien security interest on an asset in the pool –
a house.[37] A governing document for securitizations called a pooling and servicing agreement
(PSA) includes various representations and warranties for the underlying mortgages. It also
describes the responsibilities of the trustee, who is responsible for holding the recorded mortgage

---

[36] FBR Foreclosure Mania Conference Call, *supra* note 3.

[37] For an overview of REMICs, *see* Federal National Mortgage Association, *Basics of REMICs* (June 16,
2009) (online at www.fanniemae.com/mbs/mbsbasics/remic/index.jhtml). *See also* Internal Revenue Service, *Final
Regulations Relating to Real Estate Mortgage Investment Conduits*, 26 CFR § 1 (Aug. 17, 1995) (online at
www.irs.gov/pub/irs-regs/td8614.txt). Only the MBS investors are taxed on their income from the trusts' payments
on the MBS. REMICs are supposed to be passive entities. Accordingly, with few exceptions, a REMIC may not
receive new assets after 90 days have passed since its creation, or there will be adverse tax consequences. Thus, if a
transfer of a loan was not done correctly in the first place, proper transfer now could endanger the REMIC status.
For an overview of residential mortgage-backed securities in general, *see* American Securitization Forum, *ASF
Securitization Institute: Residential Mortgage-Backed Securities* (2006) (online at
www.americansecuritization.com/uploadedFiles/RMBS%20Outline.pdf).

# EXHIBIT "C" ATTACHED

# (HEREUNDER)

Decided on June 7, 2011
**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION : SECOND JUDICIAL DEPARTMENT**
ANITA R. FLORIO, J.P.
THOMAS A. DICKERSON
JOHN M. LEVENTHAL
ARIEL E. BELEN, JJ.

2010-00131
(Index No. 17464-08)

[*1]**Bank of New York, etc., respondent,**

**v**

**Stephen Silverberg, et al., appellants, et al., defendants.**

APPEAL by the defendants Stephen Silverberg and Fredrica Silverberg, in an action to foreclose a mortgage, from an order of the Supreme Court (Denise F. Molia, J.), dated September 24, 2008, and entered in Suffolk County, which denied their motion pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. Stephen C. Silverberg, PLLC, Uniondale N.Y., for appellants.

McCabe, Weisberg & Conway, P.C., New Rochelle, N.Y. (Lisa
L. Wallace and Doron Zanani of counsel), for respondent.

OPINION & ORDER

LEVENTHAL, J.This matter involves the enforcement of the rules that govern real property and whether such rules should be bent to accommodate a system that has taken on a life of its own. The issue presented on this appeal is whether a party has standing to commence a foreclosure action when that party's assignor—in this case, Mortgage Electronic Registration Systems, Inc. (hereinafter MERS) —was listed in the underlying mortgage instruments as a nominee and mortgagee for the purpose of recording, but was never the actual holder or assignee of the underlying notes. We answer this question in the negative.

In October 2006 the defendants Stephen Silverberg and Fredrica Silverberg (hereinafter together the defendants) borrowed the sum of $450,000 from Countrywide Home Loans, Inc. (hereinafter Countrywide), to purchase residential real property in Greenlawn, New York (hereinafter the property). The loan was secured by a mortgage on the property (hereinafter the initial mortgage). The initial mortgage refers to MERS as the mortgagee for the purpose of recording, and provides that the underlying promissory note is in favor of Countrywide [FN1]. Further, the initial mortgage provides that "MERS holds only legal title to the rights granted by the [defendants] . . . but, if necessary to comply with law or custom," MERS purportedly has the right to foreclose and "to take any action required of [Countrywide]." On November 2, 2006, the initial mortgage was recorded in the office of the Suffolk County Clerk.

On April 23, 2007, the defendants executed a second mortgage on the subject property in favor of MERS, as named mortgagee and nominee of Countrywide. The defendants [*2]simultaneously executed a note in favor of Countrywide, secured by the second mortgage. The promissory note secured by the second mortgage provided that payment would be made to Countrywide, and that Countrywide "may transfer this Note." The second mortgage was recorded in the office of the Suffolk County Clerk on June 12, 2007.

In sections entitled "Borrower's Transfer to Lender of Rights in the Property" set forth in both the initial mortgage and the second mortgage, those documents provide:

"[The Borrowers] understand and agree that MERS holds only legal title to the rights granted by [the Borrowers] in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

"(A) to exercise any or all of those rights, [granted by the Borrowers to Countrywide] including, but not limited to, the right to foreclose and sell the Property; and

"(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument."

*Consolidation Agreement*

Also in April 2007, the defendants executed a consolidation agreement in connection with the property in the sum of $479,000 in favor of MERS, as mortgagee and nominee of Countrywide . Countrywide was the named lender and note holder. The consolidation agreement purportedly merged the two prior notes and mortgages into one loan obligation. The consolidation agreement was recorded in the office of the Suffolk County Clerk on June 12, 2007. The consolidation agreement, as with the prior mortgages, recites that MERS was "acting solely as a nominee for [Countrywide] and [Countrywide's] successors and assigns . . . For purposes of recording this agreement, MERS is the mortgagee of record." Countrywide, however, was not a party to the consolidation agreement.

In December 2007 the defendants defaulted on the consolidation agreement. Meanwhile, on April 30, 2008, by way of a "corrected assignment of mortgage," MERS, as Countrywide's nominee, assigned the consolidation agreement to the Bank of New York, as Trustee For the Benefit of the Certificate Holders, CWALT, Inc., Alternate Loan Trust 2007-14-T2, Mortgage Pass-Through Certificates Series 2007-14T2 (hereinafter the plaintiff). On May 6, 2008, the plaintiff commenced this mortgage foreclosure action against the defendants, among others.

In June 2008 the defendants moved pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. In support of their motion, the defendants submitted, inter alia, the underlying mortgages, the summons and complaint, the second note, and an attorney's affirmation. In the affirmation, the defendants argued, among other things, that the complaint failed to establish a chain of ownership of the notes and mortgages from Countrywide to the plaintiff. In opposition to the defendants' motion, the plaintiff submitted, inter alia, the corrected assignment of mortgage dated April 30, 2008.

*The Order Appealed From*

In an order dated September 24, 2008, the Supreme Court denied the defendant's motion, concluding that, prior to the commencement of the action, MERS, as Countrywide's nominee, and on Countrywide's behalf, assigned the mortgages described in the consolidation agreement. Hence, the

Supreme Court determined that the plaintiff was the owner of the "consolidated Note and Mortgage" and, thus, the proper party to commence the action.

On appeal, the defendants argue that the plaintiff lacks standing to sue because it did not own the notes and mortgages at the time it commenced the foreclosure action. Specifically, the defendants contend that neither MERS nor Countrywide ever transferred or endorsed the notes described in the consolidation agreement to the plaintiff, as required by the Uniform Commercial Code. Moreover, the defendants assert that the mortgages were never properly assigned to the plaintiff because MERS, as nominee for Countrywide, did not have the authority to effectuate an assignment of the mortgages. The defendants further assert that the mortgages and notes were bifurcated, rendering the mortgages unenforceable and foreclosure impossible, and that because of such bifurcation, MERS never had an assignable interest in the notes. The defendants also contend {*3}that the Supreme Court erred in considering the corrected assignment of mortgage because it was not authenticated by someone with personal knowledge of how and when it was created, and was improperly submitted in opposition to the motion.
*MERS*

"In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages" (*Matter of MERSCORP, Inc. v Romaine*, 8 NY3d 90, 96). MERS was intended to "streamline the mortgage process by using electronic commerce to eliminate paper."[FN2] MERS's implementation followed the delays occasioned by local recording offices, which were at times slow in recording instruments because of complex local regulations and database systems that had become voluminous and increasingly difficult to search (*see* Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U Cin L Rev 1359, 1366 [2010]).

> "Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system" (*Matter of MERSCORP, Inc. v Romaine*, 8 NY3d at 96 [internal footnotes omitted]).

The MERS system facilitated the transfer of loans into pools of other loans which were then sold to investors as securities (*see* Peterson, at 1361-1362). MERS delivers savings to the participants in the real estate mortgage industry by allowing those entities to avoid the payment of fees which local governments require to record mortgage assignments (*see* Peterson at 1368-1369).

Lenders identify MERS as nominee and mortgagee for its members' successors and assignees. MERS remains the mortgagee of record in local county recording offices regardless of how many times the mortgage is transferred, thus freeing MERS's members from paying the recording fees that would otherwise be furnished to the relevant localities (*id.*; *see Matter of MERSCORP, Inc. v Romaine*, 8 NY3d at 100). This leaves borrowers and the local county or municipal recording offices unaware of the identity of the true owner of the note, and extinguishes a source of revenue to the localities. According to MERS, any loan registered in its system is "inoculated against future assignments because MERS remains the mortgagee no matter how many times servicing is traded."[FN3] Moreover, MERS does not lend money, does not receive payments on promissory notes, and does not service loans by collecting loan payments.
*Analysis*

Relevant to our determination is the decision of the Court of Appeals in *Matter of MERSCORP, Inc. v*

*Romaine* (8 NY3d 90), which held that the Suffolk County Clerk was compelled to record and index mortgages, assignments of mortgages, and discharges of mortgages that named MERS as the lender's nominee or mortgagee of record. In a concurring opinion, Judge Carmen Beauchamp Ciparick specified that the issue of whether MERS has standing to prosecute a foreclosure action remained for another day (*id.* at 100). In a dissent, former Chief Judge Judith S. Kaye posited that the MERS system raised several concerns, including the elimination of the public records which document mortgage loan ownership (*id.* at 100-105).

The principal issue ripe for determination by this Court, and which was left unaddressed by the majority in *Matter of MERSCORP* (*id.*), is whether MERS, as nominee and mortgagee for purposes of recording, can assign the right to foreclose upon a mortgage to a plaintiff in a foreclosure action absent MERS's right to, or possession of, the actual underlying promissory note.

Standing requires an inquiry into whether a litigant has "an interest . . . in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request" [*4](*Caprer v Nussbaum*, 36 AD3d 176, 182; *see New York State Assn. of Nurse Anesthetists v Novello*, 2 NY3d 207, 211; *Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d 239, 242). Where, as here, the issue of standing is raised by a defendant, a plaintiff must prove its standing in order to be entitled to relief (*see U.S. Bank, N.A. v Collymore*, 68 AD3d 752, 753; *Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d at 242). In a mortgage foreclosure action, a plaintiff has standing where it is both the holder or assignee of the subject mortgage and the holder or assignee of the underlying note at the time the action is commenced (*see U.S. Bank, N.A. v Collymore*, 68 AD3d at 753; *Countrywide Home Loans, Inc. v Gress*, 68 AD3d 709, 709; *Wells Fargo Bank, N.A. v Marchione*, 69 AD3d 204, 207-208; *Mortgage Elec. Registration Sys., Inc. v Coakley*, 41 AD3d 674, 674; *Federal Natl. Mtge. Assn. v Youkelsone*, 303 AD2d 546, 546-547; *First Trust Natl. Assn. v Meisels*, 234 AD2d 414).

As a general matter, once a promissory note is tendered to and accepted by an assignee, the mortgage passes as an incident to the note (*see Mortgage Elec. Registration Sys., Inc. v Coakley*, 41 AD3d 674; *Smith v Wagner*, 106 Misc 170, 178 ["assignment of the debt carries with it the security therefor, even though such security be not formally transferred in writing"]; *see also Weaver Hardware Co. v Solomovitz*, 235 NY 321, 331-332 ["a mortgage given to secure notes is an incident to the latter and stands or falls with them"]; *Matter of Falls*, 31 Misc 658, 660, *affd* 66 App Div 616 ["The deed being given as collateral for the payment of the note [,] the transfer of the note carried the security"]).

By contrast, "a transfer of the mortgage without the debt is a nullity, and no interest is acquired by it" (*Merritt v Bartholick*, 36 NY 44, 45; *see Carpenter v Longan*, 83 US 271, 274 [an assignment of the mortgage without the note is a nullity]; *US Bank N.A. v Madero*, 80 AD3d 751, 752; *U.S. Bank, N.A. v Collymore*, 68 AD3d at 754; *Kluge v Fugazy*, 145 AD2d 537, 538 [plaintiff, the assignee of a mortgage without the underlying note, could not bring a foreclosure action]; *Flyer v Sullivan*, 284 App Div 697, 698 [mortgagee's assignment of the mortgage lien, without assignment of the debt, is a nullity]; *Beak v Walts*, 266 App Div 900). A "mortgage is merely security for a debt or other obligation and cannot exist independently of the debt or obligation" (*FGB Realty Advisors v Parisi*, 265 AD2d 297, 298). Consequently, the foreclosure of a mortgage cannot be pursued by one who has no demonstrated right to the debt (*id.*; *see* Bergman on New York Mortgage Foreclosures § 12.05[1][a][1991]).

The defendants contend, among other things, that because the plaintiff failed to provide *proof of recording* of the corrected assignment of the mortgage prior to the commencement of the action, it may be inferred that the plaintiff did not own the notes and mortgages prior to that date. However, this particular contention is without merit, as an assignment of a note and mortgage need not be in writing and can be effectuated by physical delivery (*see LaSalle Bank Natl. Assn. v Ahearn*, 59 AD3d 911, 912). Moreover, " [n]o special form or language is necessary to effect an assignment as long as the language shows the intention of the owner of a right to transfer it'" (*Suraleb, Inc. v International Trade*

*Club, Inc.*, 13 AD3d 612, 612, quoting *Tawil v Finkelstein Bruckman Wohl Most & Rothman*, 223 AD2d 52, 55).

Here, the consolidation agreement purported to merge the two prior notes and mortgages into one loan obligation. Countrywide, as noted above, was not a party to the consolidation agreement. " Either a written assignment of the underlying note or the physical delivery of the note prior to the commencement of the foreclosure action is sufficient to transfer the obligation, and the mortgage passes with the debt as an inseparable incident'" *(US Bank N.A. v Madero*, 80 AD3d at 753, quoting *U.S. Bank, N.A. v Collymore*, 68 AD3d at 754; *see LaSalle Bank Natl. Assn. v Ahearn*, 59 AD3d at 912). The plaintiff relies upon the language in the consolidation agreement, which provides that MERS was "acting solely as a nominee for [Countrywide] and [Countrywide's] successors and assigns . . . For purposes of recording this agreement, MERS is the mortgagee of record." However, as "nominee," MERS's authority was limited to only those powers which were specifically conferred to it and authorized by the lender (*see* Black's Law Dictionary 1076 [8th ed 2004] [defining a nominee as "(a) person designated to act in place of another, (usually) in a very limited way"]). Hence, although the consolidation agreement gave MERS the right to assign the mortgages themselves, it did not specifically give MERS the right to assign the underlying notes, and the assignment of the notes was thus beyond MERS's authority as nominee or agent of the lender (*see Aurora Loan Servs., LLC v Weisblum,* AD3d, 2011 NY Slip Op 04184, *6-7 [2d Dept 2011]; *HSBC Bank USA v Squitieri*, 29 Misc 3d 1225[A], 2010 NY Slip Op 52000[U]; *LNV Corp. v Madison Real Estate, LLC*, 2010 NY Slip Op 33376[U]; *LPP Mtge. Ltd. [*5]v Sabine Props., LLC*, 2010 NY Slip Op 22367[U]; *Bank of NY v Mulligan,* 28 Misc 3d 1226[A], 2010 NY Slip Op 51509[U]; *OneWest Bank, F.S.B. v Drayton,* 29 Misc 3d 1021; *Bank of N.Y. v Alderazi,* 28 Misc 3d 376, 379-380 [the "party who claims to be the agent of another bears the burden of proving the agency relationship by a preponderance of the evidence"]; *HSBC Bank USA, N.A. v Yeasmin,* 27 Misc 3d 1227[A], 2010 NY Slip Op 50927[U]; *HSBC Bank USA, N.A. v Vasquez*, 24 Misc 3d 1239[A], 2009 NY Slip Op 51814[U]; *Bank of N.Y. v Trezza,* 14 Misc 3d 1201[A], 2006 NY Slip Op 52367[U]; *LaSalle Bank Natl. Assn. v Lamy,* 12 Misc 3d 1191[A], 2006 NY Slip Op 51534[U]; *Matter of Agard*, 444 BR 231; *but see US Bank N.A. v Flynn,* 27 Misc 3d 802).

Therefore, assuming that the consolidation agreement transformed MERS into a mortgagee for the purpose of recording—even though it never loaned any money, never had a right to receive payment of the loan, and never had a right to foreclose on the property upon a default in payment—the consolidation agreement did not give MERS title to the note, nor does the record show that the note was physically delivered to MERS. Indeed, the consolidation agreement defines "Note Holder," rather than the mortgagee, as the "Lender or anyone who succeeds to Lender's right under the Agreement and who is entitled to receive the payments under the Agreement." Hence, the plaintiff, which merely stepped into the shoes of MERS, its assignor, and gained only that to which its assignor was entitled (*see Matter of International Ribbon Mills [Arjan Ribbons]*, 36 NY2d 121, 126; *see also* UCC 3-201 ["(t)ransfer of an instrument vests in the transferee such rights as the transferor has therein"]), did not acquire the power to foreclose by way of the corrected assignment.

Notwithstanding the foregoing, the plaintiff contends that case law supports its position that MERS has the power to foreclose, where, as here, MERS is identified in a mortgage as nominee and mortgagee for the purpose of recording. In this regard, the plaintiff relies upon *Mortgage Elec. Registration Sys., Inc. v Coakley* (41 AD3d 674), wherein this Court held that MERS had standing to foreclose a mortgage. In that case, unlike in the current case, the lender had transferred and tendered the promissory note to MERS before the commencement of the foreclosure action (*id.* at 674). Therefore, we held that MERS had standing to bring the foreclosure action because it "was the lawful holder of the promissory note and of the mortgage, which passed as an incident to the promissory note" (*id.* at 674 [citations omitted]). Although that determination was a sufficient basis upon which to conclude that MERS had

standing, we elaborated, stating,

> "further support for MERS's standing to commence the action may be found on the face of the mortgage instrument itself. Pursuant to the clear and unequivocal terms of the mortgage instrument, [the mortgagor] expressly agreed without qualification that MERS had the right to foreclose upon the premises in the event of a default" (*id.* at 675).

According to the plaintiff, *Coakley* indicates that this Court has determined that such broad provisions in mortgages, such as the initial mortgage and second mortgage here, standing alone, grant MERS, as nominee and mortgagee for the purpose of recording, the power to foreclose. On the contrary, the *Coakley* decision does not stand for that proposition. This Court's holding in *Coakley* was dependent upon the fact that MERS held the note before commencing the foreclosure action. In the absence of that crucial fact, the language in the mortgage instrument would not have provided "further support" for the proposition that MERS had the power to foreclose in that case. Furthermore, the language in the initial mortgage and the second mortgage in this case, purportedly granting MERS the right to foreclose, was superseded by the consolidation agreement. Moreover, as discussed above, the broad language relied upon by the plaintiff cannot overcome the requirement that the foreclosing party be both the holder or assignee of the subject mortgage, and the holder or assignee of the underlying note, at the time the action is commenced.

In sum, because MERS was never the lawful holder or assignee of the notes described and identified in the consolidation agreement, the corrected assignment of mortgage is a nullity, and MERS was without authority to assign the power to foreclose to the plaintiff. Consequently, the plaintiff failed to show that it had standing to foreclose.

MERS purportedly holds approximately 60 million mortgage loans (*see* Michael Powell & Gretchen Morgenson, *MERS? It May Have Swallowed Your Loan*, New York Times, March 5, 2011), and is involved in the origination of approximately 60% of all mortgage loans in the United States (*see* Peterson at 1362; Kate Berry, *Foreclosures Turn Up Heat on MERS*, Am. [*6]Banker, July 10, 2007, at 1). This Court is mindful of the impact that this decision may have on the mortgage industry in New York, and perhaps the nation. Nonetheless, the law must not yield to expediency and the convenience of lending institutions. Proper procedures must be followed to ensure the reliability of the chain of ownership, to secure the dependable transfer of property, and to assure the enforcement of the rules that govern real property.

Accordingly, the Supreme Court should have granted the defendants' motion pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. Thus, the order is reversed, on the law, and the motion of the defendants Stephen Silverberg and Fredrica Silverberg pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing is granted.
FLORIO, J.P., DICKERSON, and BELEN, JJ., concur.

ORDERED that the order is reversed, on the law, with costs, and the motion of the defendants Stephen Silverberg and Fredrica Silverberg pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing is granted.

ENTER:

Matthew G. Kiernan

Clerk of the Court

**Footnotes**

**Footnote 1:** The promissory note executed in connection with the initial mortgage is not included in the record.

**Footnote 2:** About Us-Overview, MERS, http://www.mersinc.org/about/index.aspx (last visited Apr. 26, 2011).

**Footnote 3:** *see* About Us-Overview, MERS, http://www.mersinc.org/about/index.aspx (last visited Apr. 26, 2011).

# EXHIBIT "D" ATTACHED

# (HEREUNDER)

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE,                                    )
                                                   )
            PLAINTIFF,                             )          CASE NUMBER:
                                                   )
VS.                                                )          CV-2008-362
                                                   )
LASALLE BANK NATIONAL                              )
ASSOCIATION, AS TRUSTEE FOR                        )
CERTIFICATE HOLDERS OF BEAR                        )
STEARNS ASSET BACKED SECURITIES                    )
I LLC, ASSET BACKED CERTIFICATES,                  )
SERIES 2006-EC2; MORTGAGE                          )
ELECTRONIC REGISTRATION SYSTEMS,                   )
INC., ENCORE CREDIT CORPORATION,                   )
EMC MORTGAGE COMPANY,                              )
BANK OF AMERICA, as successor in interest          )
to Lasalle Bank National Association,              )
                                                   )
            DEFENDANTS.                            )

## AFFIDAVIT AND TESTIMONY OF THOMAS J. ADAMS

STATE OF NEW YORK        )

COUNTY OF NEW YORK    )

The deponent, being first duly sworn, deposes and says on oath as follows:

1.      My name is Thomas J. Adams.

2.      I am a partner with the firm of Paykin, Krieg & Adams in New York, New York.

3.      My area of expertise is in the field of securitization. My curriculum vitae is

attached to this affidavit.

4.      Let me briefly summarize my experience for the Court. I began my career as an

Associate at Thatcher, Proffitt & Wood in New York City working on Mortgage securitizations

in 1989. In this position I was one of the lawyers who worked on the very first vintage of

pooling and servicing agreements which dealt with the 1986 amendments to the IRS tax code

creating the REMIC Structures. My career progressed from Thatcher, Proffitt & Wood through a series of industry positions which all dealt with various aspects of Mortgage loan securitization as set out in my Curriculum vitae. I am familiar with the industry standards, customs, practices and legal requirements of mortgage loan securitizations. I am also familiar with the law governing the creation, powers, authorities and limitations of the securitization trusts and their counterparties including the Trustees and Servicers for the securitization trusts.

5.    I have been retained by the plaintiff in this matter to review the documents presented to the Court and to opine as to whether the defendant Trust in this action is in fact the owner of the promissory note secured by a mortgage upon which the plaintiff has foreclosed and claimed ownership.

6.    In formulating my opinion I have reviewed the collateral file produced by the Defendants and the securitization documents including the Trust Agreement for the Trust.

7.    The trust agreement which created the Trust that is the defendant in this action is called a Pooling and Servicing Agreement and is filed under oath with the Securities and Exchange Commission and is available online through the Edgar website at SEC.gov. The Trust agreement for this securitization is filed as exhibit 4.1 to form 8-k with the SEC. I understand these documents are part of the Court record.

8.    I am familiar with the industry standards, customs and practices which existed at the time of this securitization and continue in force through the date of this affidavit. I have personal knowledge of these standards as a result of my employment, training, education and experience as set out in my Curriculum Vitae.

9.    Section 11.03 of the PSA (page 133 of 397) is an election by the parties to the Trust that the Trust will be governed under the laws of the State of New York. This Court would

be required to consider the impact of the actions of any party to the Trust agreement which violated the Trust agreement under New York Law.

10.     The Trust agreement (known as the PSA) sets forth how the trust acquires its assets. The Trust agreement sets forth both powers and the limits of the powers of the Trust.

11.     The PSA and the Mortgage Loan Purchase Agreement when read together require that each party to the sale of the mortgage loans endorse each promissory note to the next party in the chain of title until the promissory note is endorsed to the Trustee for the benefit of the Trust. This requirement is included in Exhibit "L" of the EMC Purchase Agreement found in Section 6(a). In the PSA this requirement is found at Section 2.01 on page 56 of 397.

12.     According to the requirements set forth in the Trust Agreement I would expect to see a series of endorsements of the promissory note reflective of each party who had an ownership interest in the promissory note culminating with a blank endorsement from the depositor at the very minimum. The industry standards, customs and practices would have been for the depositor's endorsement to be filled in naming the Trustee for the benefit of the Trust but that is not expressly stated in these documents. Nevertheless, this chain of endorsements, in order to comply with this PSA, would have had to be complete on or before the closing date of this deal but in no event more than 90 days from the closing date pursuant to section 2.02(a) (page 58 of 397). The closing date of this deal was February 28, 2006 (Page 25 of 397). This would have been the industry standard, custom and practice and the absence of these endorsements on this promissory note is very compelling.

13.     In reviewing the collateral file for this loan I note that there is no evidence of transfer of the mortgage. Even though the Mortgage named MERS as nominee any assignments which would have been necessary to transfer the mortgage to the Trust would have been required

chain of endorsements required in the PSA and which any reasonable market participant would expect to be present for the purposes of establish the series of true sales set forth in the PSA to establish the chain of title on the promissory note for the purposes of bankruptcy remoteness. The claim that the Horace note has been transferred to the Trust when it is endorsed in blank simply flies in the face of the mandatory terms of the PSA and is an extreme deviation from the industry standards, customs and practices which prevailed at all times material to this transaction and which prevail today.

18.     Based on my knowledge of the terms of this transaction as well as my review of the documents presented to the Court as the evidence that this Defendant Trust owns the promissory note executed by Phyllis Horace, it is my opinion that this Trust does not own this promissory note. My opinion is based upon the evidence that the attorneys for this Trust have provided to Plaintiff's Counsel and my personal knowledge of the requirements that were applicable to this securitization through the terms of the PSA which is before the Court, the industry standards, customs and practices applicable to Residential Mortgage Backed Securities, the pleadings that are before the Court, and the contents of the collateral file which includes the

to be dated prior to the Trust closing day irrespective of whether they were recorded or not. Therefore there is no evidence of transfer in the collateral file of either the promissory note or the mortgage.

14.     The evidence in the collateral file shows an utter and complete failure of the

# EXHIBIT "E" ATTACHED

# (HEREUNDER)

FILED

**ORDERED PUBLISHED**

JUN 10 2011

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>HOWARD RICHARD VEAL, JR., and<br>SHELLI AYESHA VEAL,<br><br>              Debtors.<br>_____<br><br>HOWARD RICHARD VEAL, JR.;<br>SHELLI AYESHA VEAL,<br><br>              Appellants,<br><br>v.<br><br>AMERICAN HOME MORTGAGE SERVICING,<br>INC.; WELLS FARGO BANK, N.A., as<br>Trustee for Option One Mortgage<br>Loan Trust 2006-3 Asset-Backed<br>Certificates, Series 2006-3, and<br>its successor and/or assignees,<br><br>              Appellees.<br>_____ | BAP Nos.  AZ-10-1055-MkKiJu<br>          AZ-10-1056-MkKiJu<br>          (Related Appeals)[*]<br><br>Bk. No.  09-14808<br><br><br><br><br><br><br>     O P I N I O N |

Argued and Submitted on June 18, 2010
at Phoenix, Arizona

Filed - June 10, 2011

Appeal From The United States Bankruptcy Court
for the District of Arizona

Honorable Randolph J. Haines, Bankruptcy Judge, Presiding

---

Appearances:    Trucly D. Pham of John Joseph Volin, P.C., argued
                for Appellants Howard Richard Veal, Jr. and Shelli

---

[*]While not formally consolidated, these two related appeals
were heard at the same time, and were considered together.  This
single disposition applies to both appeals, and the clerk is
directed to file a copy of this disposition in each appeal.

1        Ayesha Veal; and Kevin Hahn of Malcolm Cisneros
argued for Appellees American Home Mortgage
2        Servicing, Inc. and Wells Fargo Bank, N.A., as
Trustee for Option One Mortgage Loan Trust 2006-3
3        Asset-Backed Certificates, Series 2006-3, and its
successors and/or assignees.

5   Before:   MARKELL, KIRSCHER and JURY, Bankruptcy Judges.

7                      **Table of Contents**

**I.    INTRODUCTION.** . . . . . . . . . . . . . . . . . . . **3**

**II.   FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . **4**
    A.   *AHMSI's Proof of Claim and the Veals' Claim Objection*
      . . . . . . . . . . . . . . . . . . . . . . . 5
    B.   *Wells Fargo's Relief from Stay Motion and the Veals'*
      *Response.* . . . . . . . . . . . . . . . . . . 7
    C.   *Joint Hearing on the Claim Objection and the Relief*
      *from Stay Motion.* . . . . . . . . . . . . . . . 10

**III.  DISCUSSION.** . . . . . . . . . . . . . . . . . . . **11**
    A.   *Standing in Mortgage Cases.* . . . . . . . . . . . 12
      1.   Constitutional Standing. . . . . . . . . . . . 12
      2.   Prudential Standing. . . . . . . . . . . . . 13
      3.   Prudential Standing and the Real Party in Interest
        Doctrine. . . . . . . . . . . . . . . . . 14
      4.   Real Party in Interest Status and Its Policies
        . . . . . . . . . . . . . . . . . . . . . 15
    B.   *The Substantive Law Related to Notes Secured by Real*
      *Property.* . . . . . . . . . . . . . . . . . . 17
      1.   Applicability of UCC Articles 3 and 9. . . . . . 17
      2.   Article 3 of the UCC and the Concept of a "Person
        Entitled to Enforce" a Note. . . . . . . . . 20
      3.   Article 9 and Transfers of Ownership and Other
        Interests in a Promissory Note.. . . . . . . . 24
    C.   *Wells Fargo's Lack of Standing to Seek Relief from the*
      *Automatic Stay.* . . . . . . . . . . . . . . . 27
      1.   Standing to Seek Relief from Automatic Stay. . 27
      2.   Wells Fargo's Argument Regarding Standing. . . 30
      3.   Wells Fargo's Lack of a Connection to the Note
        . . . . . . . . . . . . . . . . . . . . . 32
    D.   *AHMSI's Lack of Standing To File Proof of Claim..* . 37
      1.   The Lack of Findings on Central Issues.. . . . 39
      2.   Analysis of the Record and AHMSI's Status as a
        "Person Entitled to Enforce" the Note. . . . . 42

**IV.   CONCLUSION..** . . . . . . . . . . . . . . . . . . . **46**

                       *   *   *   *   *

                              2

B.    The *Substantive Law Related to Notes Secured by Real*
      *Property*

Real party in interest analysis requires a determination of
the applicable substantive law, since it is that law which
defines and specifies the wrong, those aggrieved, and the redress
they may receive.  6A <u>Federal Practice and Procedure</u> § 1543, at
480-81 ("In order to apply Rule 17(a)(1) properly, it is
necessary to identify the law that created the substantive right
being asserted . . . .").  <u>See also</u> <u>id.</u> § 1544.

1.    Applicability of UCC Articles 3 and 9[12]

Here, the parties assume that the Uniform Commercial Code
("UCC")[13] applies to the Note.  If correct, then two articles of
the UCC potentially apply.[14]  If the Note is a negotiable

---

[12]This discussion owes much to a pending commentary of the
Permanent Editorial Board for the Uniform Commercial Code.  <u>See</u>
John A. Sebert, <u>Draft Report of the PEB on the UCC Rules</u>
<u>Applicable to the Assignment of Mortgage Notes and to the</u>
<u>Ownership and Enforcement of Those Notes and the Mortgages</u>
<u>Securing Them</u> (March 29, 2011), <u>available at</u>
http://extranet.ali.org/directory/files/PEB_Report_on_Mortgage_No
tes-Circulation_Draft.pdf (last visited June 10, 2011).

[13]As all fifty states have enacted the UCC, citations to the
UCC in this opinion will be to the official text when discussing
general propositions.  Specific state enactments will be cited
when applicable.

[14]Even if the Note is not a "negotiable instrument," and
thus Article 3 would not directly apply, it may "be appropriate,
consistent with the principles stated in § 1-102(2) [now § 1-
103], for a court to apply one or more provisions of Article 3 to
the writing by analogy, taking into account the expectations of
the parties and the differences between the writing and an
instrument governed by Article 3."  Comment 2 to UCC § 3-104.
<u>See also</u> Fred H. Miller & Alvin C. Harrell, <u>The Law of Modern</u>
<u>Payment Systems</u> § 1.03[1][b] (2003).